IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2008 Session

## BEST SIGNS, INC. v. BOBBY KING, DESIGN TEAM, INC., and CITY OF SAVANNAH, TENNESSEE

### Direct Appeal from the Circuit Court for Hardin County
### No. 4098      Charles C. McGinley, Judge

---

### No. W2008-00512-COA-R3-CV - Filed January 12, 2009

---

Appellant purchased a commercial truck from a merchant who dealt in goods of that kind. Before obtaining good title, Appellant entrusted the merchant with the truck to allow the merchant to make agreed upon repairs. While the merchant had possession of the truck, he sold it to the Appellee. Appellant filed suit to recover the truck. The trial court found that Appellee was a bona fide purchaser in the ordinary course of business and that under Tenn. Code Ann. §47-2-403, Appellant's entrustment of the truck to the merchant provided the merchant the authority to transfer title to the Appellee. Finding no error, we affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Floyd S. Flippin, Humboldt, TN, for Appellant
Terri Smith Crider, Humboldt, TN, for Appellant

Terry Abernathy, Selmer, TN, for Appellee

### OPINION

Chris and Donna Sandefur are the owners of Best Signs, Inc. ("Appellant"). Best Signs manufactures and installs on-site ID signs for commercial and residential customers. In May of 2005, the Sandefurs were in the market for a truck to use in their business. Through a business acquaintance, the Sandefurs were put in contact with Appellee Bobby King, who is a dealer in the type of equipment the Sandefurs wished to purchase. Mr. Sandefur informed Mr. King that he was looking for a truck with a square-tube crane, and a two-man basket, which had a 2.5 ton lifting capacity. Mr. King informed Mr. Sandefur that he would contact him if he located a truck that met the specifications. Within a week of their initial conversation, Mr. King notified the Sandefurs that he had found a truck and emailed photos and specifications to the Sandefurs. After reviewing this information, Mr. Sandefur concluded that the truck met Best Signs' requirements except that it was

slightly larger than was needed, and appeared to have a lot of salt damage and rust. Mr. Sandefur determined that Best Signs could repair the truck in-house, and notified Mr. King that he wished to proceed with the purchase.

Mr. King brought the truck to Best Signs within a week of receiving the initial deposit check of $4,000.00. Mr. Sandefur then took the truck to a repair and service shop for the purpose of inspection. The inspection revealed that the switchbox for the two-man basket was damaged and the main boom had a hydraulic leak, which would require it to be rebuilt. Best Signs decided to proceed with the purchase on the condition that Mr. King would repair the switchbox and hydraulic leak. In addition, the parties negotiated a $2,800.00 discount because the truck bed was not painted as requested.

The agreed purchase price of the truck was $65,000.00. Best Signs received credit against this amount for the $4,000.00 deposit, the $2,800.00 discount, and an additional payment of $3,700.00. The purchase was evidenced by a Bill of Sale executed by Mr. King and Mr. Sandefur on May 24, 2005 and by an invoice reflecting the price, credits, and discount given to Best Signs. Also noted on the invoice were the two repairs to be made to the truck.

Best Signs delivered a total of five checks to Mr. King. In addition to the $4,000.00 deposit, and the $3,700.00 check mentioned above, the Sandefurs also tendered checks in the amounts of $9,500.00, $3,000.00, and $45,000.00. Best Signs financed the $45,000.00 through a loan, for which the Sandefurs executed a promissory note secured by the truck.

Best Signs took possession of the truck on May 24, 2005, with the understanding that it would be returned to Mr. King for repairs when the parts arrived. Mr. King executed a title and gave it to the Sandefurs upon delivery of the truck. Best Signs also obtained insurance on the truck. Best Signs began making its own repairs/modifications prior to returning the truck to Mr. King for the major repairs. It sandblasted the bed and bins, rhino-lined the bed and bins, made new doors for the bins, replaced the rear outriggers, replaced all assemblies in the driver and passenger doors, replaced wires running from the bottom to the top of the crane with welding leads, and repaired the hydraulic hose reels. Mr. Sandefur testified that Best Signs spent a total of 165 labor hours on the repairs, and $2,127.87 in parts. Mr. Sandefur estimated that, with the labor, Best Signs' total investment was $9,551.87 in addition to the purchase price.

In February of 2006, Mr. King notified Best Signs that he had received the ordered parts and was ready to make the agreed upon repairs. Mr. King came to Best Signs and picked up the truck and gave Best Signs a loaner truck for use while its truck was being repaired. During the time that Mr. King had the truck, the Sandefurs contacted him regularly to check the status, and eventually to inquire about the delays. Mr. King made numerous excuses for the delays. Mr. Sandefur testified that he became concerned about the continuous delays in the completion of the repairs.

After Mr. King took the truck, the Sandefurs did not see him again until they met at the bank to attempt to resolve an issue with the truck's title. The title given to the Sandefurs on the date of

purchase was a New York state title, which identified the owner of the truck as "RJD Leasing Corp." The title had been executed by what appears to be RJD Leasing Corp. and below that by Mr. King. When the Sandefurs attempted to have the truck titled in the name of Best Signs, they encountered problems because Mr. King had never titled the truck in his name. The Sandefurs, with the help of Mr. King, were eventually able to have the truck title changed to reflect their ownership.

Once the title issue was resolved, the Sandefurs did not see Mr. King again until approximately two or three days prior to learning that Mr. King had sold the truck to Appellee Design Team , Inc., a Savannah, Tennessee sign company. On that occasion, Mr. King came to Best Signs to retrieve the loaner truck. Shortly thereafter, the Sandefurs received a call from a Chicago company asking for their truck (i.e., the loaner truck). Upon further discussion, the Chicago company advised the Sandefurs that they might want to check with Design Team, Inc. concerning the truck Best Signs had purchased from Mr. King. In response, the Sandefurs contacted Mr. King who informed them that Design Team had ordered a truck from him, which had not arrived. Mr. King told the Sandefurs that he had "loaned" their truck to Design Team, pending arrival of its truck. Upon further investigation, the Sandefurs learned that, while Mr. King had possession of their truck for repairs, he had actually sold it to Design Team.

Chris Pierce, part owner of Design Team, testified that he purchased the truck for Mr. King in February 2006. Mr. Pierce also testified that he had known that Mr. King was a dealer in goods of this type for approximately eight to ten years prior to this purchase.[1] In negotiating the purchase, Mr. Pierce accepted a faxed copy of the title as Mr. King's proof of ownership. The evidence reveals that the document Chris Pierce received was a copy of the title given to Best Signs, with the exception of a notation of Design Team's address at the bottom of the title. Upon seeing the faxed title, Design Team wired the purchase price of $75,000.00 to Mr. King, who delivered the truck to Design Team's location in Savannah.

After Mr. King delivered the truck to Design Team, it was never able to obtain title to the truck. Thereafter, Design Team attempted to remove the bed and crane from the truck and place it on a new truck. Mr. King was ultimately jailed.[2] At the time of the filing of this appeal, the truck was in the possession of the Savannah, Tennessee police department.

On September 28, 2006, Best Signs filed a complaint to recover personal property against Mr. King, Design Team, Inc., and the City of Savannah, Tennessee in the General Sessions Court of Hardin County. The case was heard on November 6, 2006 and on January 5, 2007 a judgment was entered in favor of Best Signs. The January 5, 2007 order also dismissed the City of Savannah as a defendant. Design Team filed a notice of appeal in the Circuit Court at Hardin County, and on February 20, 2008 a judgment was entered in favor of Design Team. Best Signs appeals and raises

---

[1]Prior to purchasing the truck at issue in this case, Mr. Pierce testified that he had bought approximately six to eight trucks from Mr. King.

[2] The facts of Mr. King's incarceration are not part of the appellate record.

one issue for review as stated in its brief: Whether the trial court erred in its determination as to the rightful owner of the 1997 International truck and crane at issue.

Tenn. Code Ann. § 16-15-729 (Supp.2007) governs appeals from general sessions court to circuit court, and requires a *de novo* review by the circuit court.[3] As our Supreme court held in ***Ware v. Meharry Medical College***, 898 S.W.2d 181 (Tenn.1995):

> De novo appeals from the general sessions court differ from other types of appellate proceedings. The circuit court does not review the general sessions court's decision. Rather, it provides the parties an entirely new trial as if no other trial had occurred and as if the case had originated in the circuit court.

*Id.* at 184 (citations omitted).

Consequently, this Court reviews the decision of the circuit court *de novo* upon the record with a presumption of correctness as to the trial court's findings of facts. We must affirm those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); ***Union Carbide v. Huddleston***, 854 S.W.2d 87, 91 (Tenn.1993).

The Uniform Commercial Code (UCC), specifically Tenn. Code Ann. §47-2-403, governs the type of transaction at issue in this case. The statute states:

> (1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
>
> > (a) the transferor was deceived as to the identity of the purchaser, or
> > (b) the delivery was in exchange for a check which is later dishonored, or
> > (c) it was agreed that the transaction was to be a "cash sale," or
> > (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

---

[3] The statute reads: "No civil case, originating in a general sessions court and carried to a higher court, shall be dismissed by such court for any informality whatever, but shall be tried on its merits; and the court shall allow all amendments in the form of action, the parties thereto, or the statement of the cause of action, necessary to reach the merits, upon such terms as may be deemed just and proper. The trial shall be de novo, including damages."

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

(4) The rights of other purchasers of goods and of lien creditors are governed by the chapters on Secured Transactions (chapter 9 of this title) and Documents of Title (chapter 7 of this title).

The UCC defines a "Buyer in the Ordinary Course of Business" as follows:

"Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under chapter 2 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt;

Tenn. Code. Ann. §47-2-201(9).

"Good faith" is defined as "honesty in fact in the conduct or transaction concerned." Tenn. Code Ann. §47-2-201(20). From the record, it is clear that both Best Signs and Design Team were the victims of a scheme orchestrated by Mr. King. Although the equities may dictate another conclusion, we are bound by the mandates of the UCC. Here, the trial court specifically found that Design Team was a buyer in the ordinary course of business, and was a bona fide purchaser. Despite

Best Signs' argument on appeal, we find that the trial court's finding is supported by the record. The facts indicate that Design Team purchased the truck from Mr. King without knowledge that this transaction violated Best Signs' rights. Moreover, it is undisputed that Mr. King was a "a merchant who deals in goods of that kind"– a fact that both Best Signs and Design Team acknowledge. Under the statutory definition set out above, Design Team is a buyer in the ordinary course of business. The record also reveals that neither Best Signs nor Design Team was able to receive a Certificate of Title from Mr. King at the time of purchase. In fact, Best Signs did not obtain a valid title until September 2006, which was approximately sixteen months after it purchased the truck, and approximately seven months after Design Team purchased the truck.

The gravamen of this case rests on the question of whether Best Signs "entrusted" the truck to Mr. King, a "merchant who deal[t] in goods of that kind," for repairs. As set out in the statute, entrusting includes "any delivery and any acquiescence in retention of possession *regardless of any condition expressed between the parties*...." Tenn. Code Ann. §47-2-403(3). According to the statute, such entrustment on the part of Best Signs would give Mr. King "power to transfer all rights of the entruster (i.e., Best Signs) to a buyer (i.e., Design Team) in ordinary course of business." Tenn. Code Ann. §47-2-403(2).

Best Sign relies upon the case of ***Ballard v. Wetzel***, No. 03A01-9705-CH-00189, 1997 WL 650878 (Tenn. Ct. App. Oct. 16, 1997) to support its argument for ownership of the disputed truck. We find Best Signs' reliance upon this case to be misplaced. In ***Ballard***, the Court's decision was based, *inter alia*, upon a finding that the goods at issue were "stolen or otherwise obtained against the will of the owner." ***Id***. at *2. In this case, Best Signs voluntarily relinquished possession of the truck to Mr. King. As stated in the UCC, entrustment to a merchant who deals in goods of that kind gives that merchant power to transfer all rights of the entruster to a buyer in ordinary course of business "regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law." Tenn. Code Ann. §47-2-403. Although the actions of Mr. King appear to rise to the level of larceny under the criminal law, this fact does not negate the power that was conferred on him by the Sandefurs' act of voluntarily entrusting him with the truck. Under the applicable statute, once the entrustment was made, Mr. King was vested with the authority to transfer ownership of the truck to Design Team, a bona fide purchaser and buyer in the ordinary course of business, *see supra*.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Best Signs, Inc. and its surety.

 

_____
J. STEVEN STAFFORD, J.